Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the award, the Full Commission AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner with modifications as follows:
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as
STIPULATIONS
1. The parties are subject to and bound by the North Carolina Workers' Compensation Act.
2. The employer-employee relationship existed between the parties at all times relevant to this claim.
3. National Union Fire Insurance Company of Pittsburgh, PA. is the carrier on the risk.
4. The date of the alleged injury by accident is April 22, 1991.
5. The Form 19 dated November 27, 1991 was submitted.
6. A Form 22 was submitted.
7. The parties submitted medical records for plaintiff.
*************
The Full Commission adopts the findings of fact of the Deputy Commissioner with modifications and finds as follows:
FINDINGS OF FACT
1. The Industrial Commission has jurisdiction over this claim, all parties being properly before the Commission and subject to and bound by the North Carolina Workers' Compensation Act.
2. Plaintiff was born December 18, 1957 and has lived in Burke County all her life. She has a high school equivalency degree.
3. Plaintiff began working for the defendant Saft America in 1981. In 1991, plaintiff was working as a winder. She sat at the winding machine which she operated by pedal and buttons on the table. Her job involved rolling materials up like a jelly roll and placing them into a can in a tray to her left. Her job generally involved reaching out in front and to her left, and using her arms at shoulder height.
4. Plaintiff's average weekly wage as of April 22, 1991 was $413.22, yielding a compensation rate of $275.49.
5. The repetitive motion plaintiff used at work sometimes caused her muscle soreness. As early as May, 1988 plaintiff had complained to the plant nurse of pain in her neck, shoulder, back and arms. In March, 1988, plaintiff saw Dr. Grey Winfield, an orthopaedic surgeon, with complaints of left upper extremity pain. Dr. Winfield was of the opinion these complaints were caused by overuse at work. This was the last time plaintiff sought medical attention outside of work for her upper extremity pain prior to April 22, 1991.
6. On April 22, 1991, as she was working as a winder, plaintiff reached across to her left with her right hand to place the materials in the tray, and as she did she felt a pop in her neck, with the immediate onset of pain. Although plaintiff had complained earlier that month of muscular type soreness in her upper extremities, the pain she felt on this occasion was different and more severe.
7. Tony Hubbs, the supervisor of the battery assembly area, happened to come by plaintiff's work area and she told him something had popped in her neck and she had hurt herself, and that she needed to go to the doctor.
8. The next day plaintiff went to see Dr. Winfield. She complained of a sudden onset of pain in her neck. Dr. Winfield gave her cortisone injections.
9. Plaintiff's neck pain and upper extremity pain continued to increase and she started missing work. By August, 1991, the cortisone injections offered by Dr. Winfield were not giving her relief.
10. By early November, 1991, plaintiff was no longer able to work due to her continued pain. Her employer referred her to Dr. S. A. Deekens, and she was evaluated by his physician's assistant, Bill Vaassen on November 11, 1991. A MRI of the cervical spine was ordered. As of November 11, 1991, Dr. Deekens indicated she was totally disabled from work.
11. Vaassen referred plaintiff for a neurological consultation to Dr. Mark Marchese, who saw plaintiff on November 26. He reviewed the MRI which showed a right-sided disc protrusion at C5-6. His impression was a probable disk herniation at C5-6. He recommended a cervical myelogram, and indicated that plaintiff was disabled from work.
12. Plaintiff continued under the care of Dr. Marchese with conservative treatment. Following her myelogram in April, 1992, plaintiff was referred for physical therapy.
13. On April 27, 1992, plaintiff was seen for a second opinion by Dr. William O. Bell, a neurosurgeon at Bowman Gray School of Medicine. He noted the bulge at C5-6, with indentation of the spinal cord on the right side. After examining her and reviewing her test results, his assessment was that the neck injury was causing nerve compression that was causing the pain in her right arm. He also believed there might be some ligamentous or soft tissue injury. Dr. Bell concluded that surgery might offer her a 60 to 70 percent chance of improvement.
14. Plaintiff underwent surgery on May 15, 1992, when Dr. Bell performed a cervical diskectomy at C5-6. Dr. Bell removed the ruptured disk material as well as a spur on the right side of the spinal canal posterior to the disk.
15. Following surgery, plaintiff was referred to physical therapy at Burke Rehabilitation Center. Although her symptoms improved over the summer through the physical therapy, she continued to have problems with her shoulder. Dr. Bell kept her out of work through September 30, 1992.
16. Due to her continued complaints of shoulder problems, Dr. Bell referred plaintiff to Dr. David Martin for an orthopaedic consultation. Dr. Martin saw plaintiff on October 15, 1992 and again on November 5. When he first saw her he assessed mild right shoulder impingement. However, on her second visit, he noted she had full range of motion of the shoulder, with no evidence of nerve impingement or shoulder pathology. He did not believe her problems were coming from her shoulder and believed most of her problems were coming from her neck. He then referred her back to Dr. Bell for any further follow up.
17. When he last saw her on December 18, 1992, Dr. Bell believed he had nothing further to offer plaintiff and indicated he would see her as needed. Dr. Bell indicated plaintiff could return to work as long as she could perform adequately. He did not place any restrictions on her. Plaintiff had reached maximum medical improvement.
18. On April 22, 1991, plaintiff sustained a specific traumatic incident, when, as she was reaching with her right hand to put her work in a tray to her left, she felt a pop in her neck, accompanied by the onset of severe pain.
19. As a result of her specific traumatic incident of April 22, 1991, plaintiff sustained injury to her neck which resulted in pain in her neck and right shoulder and arm. Eventually it was determined that she had a ruptured disk at C5-6, as well as probable soft tissue injury.
20. As a result of her injuries, plaintiff missed work for various periods of time from August, 1991 until November 26, 1991. She took vacation or sick leave during these absences, and did not lose any wages.
21. As a result of her injuries, plaintiff was unable to engage in gainful employment from November 11, 1991 until December 18, 1992, when she was released to return to work without restriction. There is no evidence that plaintiff made reasonable efforts to find suitable employment after she was released to return to work.
22. There is no evidence that plaintiff has been rated for permanent partial impairment.
**************
The foregoing stipulations and findings of fact engender the following
CONCLUSIONS OF LAW
1. On April 21, 1991, plaintiff sustained an injury by accident arising out of and in the course of her employment when she suffered a specific traumatic incident when, as she was reaching with her right hand to place her work in a tray to her left she felt a pop in her neck accompanied by the sudden onset of pain. N.C.G.S. § 97-2.
2. As a result of the accident of April 22, 1991, plaintiff sustained injury to her neck, specifically a herniated disk at C5-6 and soft tissue injury, which also caused problems with her right shoulder and arm.
3. As a result of her injury by accident, plaintiff has incurred medical expenses which were reasonably necessary to effect a cure or give relief or lessen her period of disability, including the expenses for her cervical diskectomy and follow-up physical therapy. Plaintiff is entitled to compensation for such medical treatment.
4. As a result of her injuries sustained in the accident of April 22, 1991, plaintiff has been unable to work from time to time from August, 1991 to November 11, 1991. However, during this time, plaintiff took sick or vacation leave, and plaintiff offered no evidence that she actually lost wages during this time.
5. As a result of her injuries, plaintiff was temporarily totally disabled from work and is entitled to temporary total disability benefits from November 11, 1991 until December 18, 1992.
*****************
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
AWARD
1. Defendants shall pay all medical expenses incurred or to be incurred in the future by plaintiff as a result of injuries sustained on April 22, 1991, including the costs of the cervical diskectomy performed by Dr. Bell, and the follow-up treatment when bills for same have been submitted and approved through procedures adopted by the Industrial Commission.
2. Defendants shall pay plaintiff compensation at the rate of $275.49 per week from November 11, 1991 through December 18, 1992. Said compensation shall be paid in a lump sum, subject to an attorney's fee.
3. A reasonable attorney's fee in the amount of twenty-five percent of the compensation awarded plaintiff herein is approved for plaintiff's counsel, to be deducted from the compensation due plaintiff and paid directly to her attorney.
4. Defendants shall pay the costs due this Commission.
****************
ORDER
IT IS HEREBY ORDERED that a determination of what amount of permanent partial impairment compensation, if any, is due plaintiff is reserved for subsequent determination after plaintiff has been rated.
 S/ __________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/ __________________ J. HOWARD BUNN, JR. CHAIRMAN
S/ __________________ THOMAS J. BOLCH COMMISSIONER
BSB:md